**IN THE DISTRICT COURT OF THE UNITED STATES**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

**CIVIL CASE NO. 3:06cv066**

| | |
|---|---|
| **THE ATTIC TENT, INC.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **MEMORANDUM OF** |
| **vs.** ) | **DECISION AND ORDER** |
| ) | |
| **JERRY L. COPELAND and** ) | |
| **PROGRESSIVE ENERGY** ) | |
| **SOLUTIONS, INC.,** ) | |
| ) | |
| **Defendants.** ) | |
| _____ ) | |

**THIS MATTER** is before the Court on the parties' respective motions for the construction of certain claim language used in U.S. Reissue Patent No. Re. 36,975 (issued Dec. 5, 2000) ("the '975 Patent") [Doc. 180-6].

## I.     PROCEDURAL HISTORY

The Plaintiff The Attic Tent, Inc. ("Plaintiff") filed this action on February 16, 2006 against the Defendants Jerry L. Copeland and Progressive Energy Solutions, Inc. (collectively, "Defendants"), alleging patent infringement of the '975 Patent, as well as a claim for unfair competition in violation of North Carolina law.  [Doc. 1].  The Plaintiff moved for a preliminary injunction, which

the Court denied on March 28, 2006. [Doc. 27]. In their answer, the Defendants asserted, among other defenses, the defenses of non-infringement and invalidity and further asserted counterclaims for false marking in violation of 35 U.S.C. §292, patent misuse, and unfair and deceptive trade practices in violation of North Carolina law, as well as a declaratory judgment for non-infringement and/or unenforceability. [Doc. 18].

The parties engaged in a period of discovery, which resulted in the filing of multiple motions to compel [Docs. 36, 54, 82, 98, 107], motions to disqualify counsel [Docs. 43, 49, 139], and motions for protective order [Docs. 96, 128], leading the Magistrate Judge assigned to this matter to declare that this case was "perhaps the most contentious case [he] has handled in over fourteen years on the bench." [Doc. 132 at 1]. On September 18, 2007, this matter was reassigned to the undersigned. On November 28, 2007, the Court entered an Amended Pretrial Order and Case Management Plan [Doc. 174], extending certain scheduling deadlines and establishing a Markman[1] proceeding schedule. The parties have filed their respective briefs in accordance with that schedule, and subsequently communicated to the Court that, because the issue of claim construction could be resolved upon

_____

[1]Markman v. Westview Instruments, Inc., 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996).

consideration of the parties' briefs, a claim construction hearing was not required.  [Doc. 183].  Having received and reviewed all of the parties' briefs and supporting documentation, the Court deems the issue of claim construction now ripe for disposition.

## II.    FACTUAL BACKGROUND

The invention claimed in the '975 Patent is for an insulated attic hatchway cover.   The inventor filed the original patent application on November 16, 1994.  During the examination process, the patent examiner located conflicting prior art that was a barrier to patentability of the invention as claimed.  The application subsequently was amended so as to limit Claim 1, which at the time was the only independent claim of the application, by adding the limitation that each of the walls be "of a rigid construction."  The amended application was allowed and issued as U.S. Patent No. 5,481,833 ("the '833 Patent").

Nearly two years after the original patent was issued, the inventor filed an application seeking to expand the scope of the '833 Patent.   This application went through the examination process, with a series of rejections and amendments, and ultimately was issued as Reissue Patent No. 36,975. The '975 Patent includes twelve claims, of which only Claims 1-4, 7, and 8 are

asserted in the present case.  Of these asserted claims, only Claims 1 and 7 are independent claims, with the other asserted claims depending either directly or indirectly from Claim 1.[2]

## III.  PRINCIPLES OF CLAIM CONSTRUCTION

"The determination of infringement is a two-step process.  First, the court construes the claims to correctly determine the scope of the claims.  Second, it compares the properly construed claims to the accused device." Bell Atlantic Network Services, Inc. v. Covad Communications Group, Inc., 262 F.3d 1258, 1267 (Fed. Cir. 2001).  The first step in this process, the construction of claims, is a question of law for the Court.  Markman v. Westview Instruments, Inc., 517 U.S. 370, 372, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996); Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1456 (Fed. Cir. 1998) (en banc).  The second step, the comparison of the properly construed claims to the accused device, is typically a question of fact for the jury.  See Bell Atlantic, 262 F.3d at 1267.

"It is well-settled that, in interpreting an asserted claim, the court should look first to the intrinsic evidence of record, i.e., the patent itself, including the

_____

[2]Dependent claims include all of the limitations of the independent claim plus the additional limitations added in the respective dependent claim.  See 35 U.S.C. §112 ¶4 ("A claim in dependent form shall be construed to incorporate by reference all the limitations of the claim to which it refers.").

claims, the specification and, if in evidence, the prosecution history. Such intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language." Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996) (citation omitted). The Court should give the disputed claim terms "their ordinary and accustomed meaning as understood by one of ordinary skill in the art." Bell Atlantic, 262 F.3d at 1267.

As the Federal Circuit has stated:

> In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words. In such circumstances, general purpose dictionaries may be helpful. In many cases that give rise to litigation, however, determining the ordinary and customary meaning of the claim requires examination of terms that have a particular meaning in a field of art. Because the meaning of a claim term as understood by persons of skill in the art is often not immediately apparent, and because patentees frequently use terms idiosyncratically, the court looks to those sources available to the public to show what a person of skill in the art would have understood disputed claim language to mean. Those sources include the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art.

Phillips v. AWH Corp., 415 F.3d 1303, 1314 (Fed. Cir. 2005), cert. denied, 546 U.S. 1170, 126 S.Ct. 1332, 164 L.Ed.2d 49 (2006) (citations and internal quotation marks omitted).

To begin with, the claims of the patent "themselves provide substantial guidance as to the meaning of particular terms." Id. Specifically, the context in which a term is used within the claim, as well as the usage of that term in other claims of the patent, can be valuable in ascertaining the meaning of a particular claim term. Id. Of course, the claims of the patent cannot be viewed in a vacuum. "Rather, [the Court] must look at the ordinary meaning in the context of the written description and the prosecution history." Medrad, Inc. v. MRI Devices Corp., 401 F.3d 1313, 1319 (Fed. Cir. 2005) (quoting DeMarini Sports, Inc. v. Worth, 239 F.3d 1314, 1324 (Fed. Cir. 2001)).

The specification of the patent can be highly instructive in construing the patent claims. As the Federal Circuit has noted, the specification "is always highly relevant to the claim construction analysis." Vitronics, 90 F.3d at 1582. In fact, the specification is usually dispositive, as "it is the single best guide to the meaning of a disputed term." Id.; Standard Oil Co. v. Am. Cyanamid Co., 774 F.2d 448, 452 (Fed. Cir. 1985) ("The specification is ... the primary basis for construing the claims."). As such, the Federal Circuit has stated that

it is "entirely appropriate for a court, when conducting claim construction, to rely heavily on the written description for guidance as to the meaning of the claims." Phillips, 415 F.3d at 1317.  In some cases, the inventor may provide within the specification a special definition of a claim term which differs from the term's usual meaning.  "In such cases, the inventor's lexicography governs."  Id. at 1316.  The inventor also may disclaim or disavow claim scope within the specification.  Where "the inventor has dictated the correct claim scope, ... the inventor's intention, as expressed in the specification, is regarded as dispositive."  Id.

In addition to consulting the specification, the Court also may examine the patent's prosecution history in construing the terms of the claims. Markman v. Westview Instruments, Inc., 52 F.3d 967, 980 (Fed. Cir. 1995), aff'd, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996).  "Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent."  Phillips, 415 F.3d at 1317.  The prosecution history also may be helpful in determining whether the inventor disclaimed any particular interpretation during the prosecution of the patent. See Chimie v. PPG Industries, Inc., 402 F.2d 1371, 1384 (Fed. Cir. 2005). While it can be helpful in some respects, the prosecution history "often lacks

the clarity of the specification and thus is less useful for claim construction purposes." Phillips, 415 F.3d at 1317.

In construing patent terms, the Court is also authorized to consider certain extrinsic evidence, "including expert and inventor testimony, dictionaries, and learned treatises." Markman, 52 F.3d at 980. While such extrinsic evidence may be useful in "shed[ding] ... light on the relevant art," it is "less significant than the intrinsic record in determining the 'legally operative meaning of disputed claim language.'" C.R. Bard, Inc. v. U.S. Surgical Corp., 388 F.3d 858, 862 (Fed. Cir. 2004) (quoting in part Vanderlande Indus. Nederland BV v. Int'l Trade Comm'n, 366 F.3d 1311, 1318 (Fed. Cir. 2004)). "In sum, extrinsic evidence may be useful to the court, but it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." Phillips, 415 F.3d at 1319.

## IV.    DISCUSSION

### A.    Construction of the Claims is Required in This Case

As a preliminary matter, the Plaintiff argues that the Court need not engage in any construction of the claim terms of the '975 Patent because "the ordinary meaning of these terms [is] readily apparent to one of skill in the relevant art." [Doc. 180 at 9-10, 15].

While it is true that the Court is not required to construe each and every term in the claims, the Plaintiff's suggestion that no claim construction is required in this case at all is simply erroneous. "Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement." U.S. Surgical Corp. v. Ethicon, Inc., 103 F.3d 1554, 1568 (Fed. Cir. 1997). In the present case, there are several claim terms which are not in dispute, either because the parties are in agreement as to their meaning or the claims are simply not at issue in this litigation. [Joint Stipulation, Doc. 179 at 1-2]. There are also several claim terms on which the parties do not agree, and the meaning and technical scope of these terms remain in dispute. [Joint Stipulation, Doc. 179-2 at 1-9]. The fact that these disputed terms may have commonly understood meanings, as suggested by the Plaintiff, does not relieve the Court of its duty to construe the claims. "A determination that a claim term 'needs no construction' or has [a] 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute." O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., 521 F.3d 1351, 1361 (Fed. Cir. 2008), reh'g

en banc denied June 11, 2008. The Plaintiff's suggestion that a claim construction is not required in this case must be rejected.

### B. The Level of "Skill in the Art" That is Required

Another preliminary matter that the Court must address before engaging in a construction of the claims is the issue of the level of skill in the art applicable to the interpretation of the '975 Patent. As the Federal Circuit has repeatedly instructed, the claim terms must be "examined through the viewing glass of a person skilled in the art." Ferguson Beauregard/Logic Controls, Div. of Dover Resources, Inc. v. Mega Sys., LLC, 350 F.3d 1327, 1338 (Fed. Cir. 2003); see also Phillips, 415 F.3d at 1313 ("We have made clear, moreover, that the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application."); Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc., 381 F.3d 1111, 1116 (Fed. Cir. 2004) ("A court construing a patent claim seeks to accord a claim the meaning it would have to a person of ordinary skill in the art at the time of the invention."); see also 35 U.S.C. §112 ¶1 (requiring patent specification to set forth "a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise,

and exact terms as to enable *any person skilled in the art* to which it pertains, or with which it is more nearly connected, *to make and use* the same") (emphasis added). "The inquiry into how a person of ordinary skill in the art understands a claim term provides an objective baseline from which to begin claim interpretation." Phillips, 415 F.3d at 1313.

The Defendants contend that, because the subject invention was designed to be installed and used by homeowners in insulating their homes, the level of "ordinary skill in the art" applicable to the interpretation of this patent is the level of skill possessed by the average homeowner, and that no special skills are needed to understand the workings of the invention. As such, the Defendants argue, the claim terms should be interpreted in light of the words that the average homeowner would use and understand. [Doc. 182 at 10-11].

The Court disagrees. It is well-settled that "inventors are typically persons skilled in the field of the invention." Phillips, 415 F.3d at 1313; In re Nelson, 280 F.2d 172, 181 (C.C.P.A. 1960) ("The descriptions in patents are not addressed to the public generally, to lawyers or to judges, but, as section 112 says, to those skilled in the art to which the invention pertains or with which it is most nearly connected."), overruled on other grounds by In re Kirk,

376 F.2d 936 (C.C.P.A. 1967); 2 R. Carl Moy, <u>Moy's Walker on Patents</u> §7.1 (4th ed. 2007) (noting that a "person skilled in the art" is commonly defined as "a typical inventor or designer active in the relevant field"). Accordingly, the claim terms at issue must be considered in light of the skill of a typical inventor or designer of attic hatchway covers, not in light of the skill of the average homeowner who might use the invention. With this in mind, the Court now turns to the construction of the disputed claim terms.

**C.    Claim Construction**

**1.    Claim 1**

Claim 1 of the '975 Patent provides as follows:

> 1.    An attic hatchway cover arranged for securement onto a framework of an attic opening, wherein the cover comprises,
>
> a first side wall spaced from a second side wall and a front wall connected to a rear wall, wherein the front wall is fixedly and obliquely secured to the first side wall and the second side wall, and the rear wall is obliquely and fixedly secured to the first side wall and the second side wall, and the rear wall spaced from the front wall, a top wall extending coextensively to the front wall, the first side wall, the second side wall, and the rear wall to define a cavity within the cover, and
>
> the top wall having a zipper member, and the zipper member having a first end spaced from a second end, and the top wall having a flap hingedly secured to the

top wall between the first end and the second end, and selectively secured to the top wall through the zipper member, wherein the front wall, the rear wall, the first side wall, and the second side wall are each of a rigid construction.

'975 Patent, Col. 3, lines 5-24.

It is apparent from the parties' briefs that the construction of the last element of this claim, which requires the walls to be "each of a rigid construction," is of primary significance in this litigation. Accordingly, the Court will begin its analysis with the construction of that particular phrase.

### a. "wherein the front wall, the rear wall, the first side wall, and the second side wall are each of a rigid construction"

The Plaintiff argues that the phrase "wherein the front wall, the rear wall, the first side wall, and the second side wall are each of a rigid construction" was adopted to overcome a prior art reference which claimed a flexible construction with a supporting structure. The Plaintiff argues that this phrase therefore should be construed to encompass walls that are either "rigid" or "semi-rigid" in construction, so long as they are sufficiently rigid to support the top wall in use without the need for supporting structure. The Plaintiff contends that its construction comports with the ordinary meaning of the claim language, the specification, and the prosecution history. [Doc. 180 at 21-23].

The Defendants argue, on the other hand, that the ordinary meaning of this claim language precludes a wall that is semi-flexible or semi-rigid. The Defendants contend that the specification and the prosecution history support a construction of this phrase which requires each of the walls to be stiff, unyielding, and unbendable – in short, inflexible. [Doc. 182 at 14-16].

The Court begins with the plain meaning of the claim language itself. The term "rigid" is commonly defined as "devoid of flexibility," or the opposite of flexible. See Webster's Third New International Dictionary 1957 (2002) (defining rigid as "very firm rather than pliant in composition or structure; lacking or devoid of flexibility"); Merriam-Webster's Online Dictionary, http://www.merriam-webster.com/dictionary/rigid (last visited Oct. 21, 2008) (defining rigid as "deficient in or devoid of flexibility").

Having determined the ordinary meaning of the term, the Court now turns to the intrinsic evidence in order to determine whether this ordinary dictionary meaning "is consistent with the use of the claim term in the context of the claims and the written description and to determine if the presumption of ordinary and customary meaning is rebutted." International Rectifier Corp. v. IXYS Corp., 361 F.3d 1363, 1370 (Fed. Cir. 2004). A review of the intrinsic evidence reveals that the use of the term "rigid" within the specification is

consistent with this ordinary meaning.  See '975 Patent, Col. 2, lines 11-14;

Col. 2, lines 54-58 (distinguishing "rigid or at least semi-rigid construction"

from walls of "flexible construction").  The specification also provides support

for excluding "semi-rigid" walls from the scope of this claim limitation, as the

specification explicitly distinguishes between "rigid" construction and "semi-

rigid" construction in describing the types of permissible construction of the

inventive structure.  See id. at Col. 2, lines 11-14.

The prosecution history confirms that the term "rigid" was accepted

deliberately as a limitation to the independent claims so that the claims would

be allowed, and that its meaning was understood to be the opposite of

"flexible."  The prosecution history discloses that in July 1995, the patent

examiner conducted a search of the prior art and noted prior art references

that he believed related to the patentability of the claims and potentially would

prevent allowance.  [Doc. 171-14 at 12].  Specifically, the patent examiner

found that one of the prior art patents, U.S. Patent No. 4,33,602 ("King

reference") discloses "a *flexible* cover having a zipper member."  [Id. at 10].[3]

The record reveals that during a telephone interview with the examiner, the

---

[3]The King reference, U.S. Patent No. 4,33,602, Col. 1, lines 34-36, claims a
hatchway cover that is formed of a "flexible envelope supported on a few vertical posts."
[Doc. 180-12].

inventor's counsel at the time agreed to reduce the scope of Claim 1 of the application by adding to it the limitation of Claim 3, which at that time claimed that the front, rear, and side walls of the structure were "each of a rigid construction." [Id. at 14]. The amendment was allowed, and the limitations of Claim 3 were added to Claim 1 by an Examiner's Amendment:

> [T]he claims are allowable because none of the prior art of record adequately teaches or suggest[s] a cover having the combination of *rigid front, rear, and side walls* with a top wall having a zipper member selectively securing a hingedly secured flap as claimed."

[Id. at 10] (emphasis added).

Based upon the common and ordinary meaning of the term "rigid," the distinction made in the specification between "rigid," "semi-rigid," and "flexible" construction, and the adding of the "rigid" limitation in the prosecution history to overcome a prior art reference for a "flexible" cover, the Court concludes that the term "rigid" should be construed to mean inflexible, and that the term does not encompass walls that are "flexible" or "semi-rigid." Further, because the claims require that the front, rear, and side walls "are *each* of a rigid construction," the Court concludes that the rigidity of construction must be assessed for each wall individually and not in the context of the structure as a whole or in combination with one or more of the other walls. Accordingly,

the Court construes the phrase "wherein the front wall, the rear wall, the first side wall, and the second side wall are each of a rigid construction" to mean that the front, rear, and side walls of the cover are made in such a way that each such wall is inflexible.

**b.** **"a first side wall spaced from a second side wall and a front wall connected to a rear wall"**

The Plaintiff contends that the phrase "a first side wall spaced from a second side wall and a front wall connected to a rear wall" should be construed to mean that the attic hatchway cover has a front wall, a rear wall, and two side walls that are connected or formed to define a space. The Plaintiff contends that this construction comports with the ordinary meaning of the claim terms to one of skill in the relevant art and as defined in the specification. [Doc. 180 at 16]. The Defendants propose a similar construction of this phrase, arguing that the specification and the patent drawings clearly depict and describe a four-sided structure in which the front and rear walls are connected at their respective ends by side walls. [Doc. 182 at 17].

The Abstract of the '975 Patent describes the invention as "a tent-like structure having side walls, a front wall, and a rear wall ...." '975 Patent,

Abstract.   The specification describes the preferred embodiment of the invention as being "formed with a front wall 14 spaced from a rear wall 17 and a first side wall 15 spaced from a second side wall 16," which, when combined with a top wall, creates "a container assembly."  Id. at Col. 2, lines 9-12.  The patent drawings depict the invention as a four-sided structure which defines an interior space.  Based upon this intrinsic evidence, the Court concludes that the phrase "a first side wall spaced from a second side wall and a front wall connected to a rear wall" means that the attic hatchway cover has a front wall, a rear wall, and two side walls that are connected or formed to define a space.

> **c.    "wherein the front wall is fixedly and obliquely secured to the first side wall and the second side wall, and the rear wall is obliquely and fixedly secured to the first side wall and the second side wall, and the rear wall spaced from the front wall"**

The Defendants argue that the phrase "wherein the front wall is fixedly and obliquely secured to the first side wall and the second side wall, and the rear wall is obliquely and fixedly secured to the first side wall and the second side wall, and the rear wall spaced from the front wall" should be construed to mean that the front wall and rear wall are each *immovably fastened* to the side walls; that the angle of attachment between the front wall or rear wall and

each of the side walls is not a right angle; and that the rear wall and the front wall are separated from each other by space.  [Doc. 182 at 18-19].

The Plaintiff contends, on the other hand, that this phrase should be construed to mean that the attic hatchway cover has front and rear walls that are *non-removably connected* to the two side walls to define the space, and that the angles between the walls not being exact right angles.  The Plaintiff objects to defining "fixedly" to mean "immovably," arguing that the term "fixedly" is considered synonymous with "non-removably" in patent parlance. [Doc. 180 at 17-18].[4]

The term "fixedly" is used only in the claims; it does not appear anywhere in the specification, nor is it discussed in the prosecution history. Viewing the term in the context of the claims, the term "fixedly" describes the

---

[4]The Plaintiff characterizes the Defendants' argument on this point as being "disingenuous" and "shocking."  See Doc. 180 at 17; Doc. 184 at 12.  In fact, the Plaintiff repeatedly levels the accusation that the Defendants are being disingenuous throughout its opening brief.  See Doc. 180 at 7, 17, 18, 20, 22, 26, 28, 29.  The Plaintiff continues to accuse the Defendants of being disingenuous in its responsive brief as well.  See Doc. 184 at 3, 6, 15, 17, 19, 21 and 24.  The Plaintiff's characterization of the Defendants' argument as "disingenuous" and "shocking" is hyperbolic at best.  At worst, it appears to be an unwarranted attempt to impugn the character of the Defendants and their counsel.  To accuse the Defendants of being disingenuous goes far beyond stating a disagreement with their arguments; it suggests that the Defendants or their counsel are lacking in candor with the Court, a serious allegation which if true would constitute a breach of counsel's ethical obligations.  See N.C. R. Prof. Conduct 3.3. The Court does not take allegations of ethical misconduct lightly and looks with great disfavor on such charges being made or even alluded to absent some well-founded factual basis.  In the future, counsel is cautioned to refrain from characterizing their opponents' arguments in such a manner absent a legitimate reason to do so.

manner in which the front and rear walls are "secured" to the side walls of the cover. '975 Patent, Col. 3, lines 9-13. The term "secured" implies that the walls are attached in such a way that they are "made fast." <u>See</u> <u>Webster's Third New International Dictionary</u> at 2053. The term "fixedly" is commonly used to define something that is "in a fixed manner" or that is "immovably or securely in position." <u>Webster's Third New International Dictionary</u> at 861 (defining "fixedly" as "in a fixed manner" and "fixed" as "securely placed or fastened"); <u>Merriam-Webster's Online Dictionary</u>, http://www.merriam-webster.com/dictionary/fixed (last visited Oct. 21, 2008) (defining "fixed" as "securely placed or fastened"); and http://encarta.msn.com/dictionary/fixedly.html (last visited Oct. 21, 2008) (defining "fixed" as "immovable or securely in position"). The use of these terms, as they are commonly defined, indicates that Claim 1 of the Patent requires that the front and rear walls of the subject invention are attached to the side walls in an immovable and fixed manner.

The Plaintiff contends that "in patent parlance," the term "fixedly" is synonymous with "non-removably," and thus the use of the term "fixedly" within the claims suggests that the walls are "joined by integral formation, stitching, gluing, etc., such that their separation would cause damage to the

attic hatchway cover." [Doc. 180 at 17-18]. The Plaintiff, however, cites to nothing in the specification or prosecution history which would support this construction. While the Plaintiff cites to another patent, U.S. Patent No. 7,063,389 ("the '389 Patent") [Doc. 180-9], in support of its proposed construction, the '389 Patent relates to a seat belt for attachment to seatbelt-ready seat frames and thus is in an entirely different field of art from that of the currently disputed patent claims. As such, the Court fails to see the relevance of the '389 Patent to construing terms in the patent-in-suit. The Plaintiff has cited nothing to support its contention that the term "fixedly" should be so limited in scope as to apply only to walls that are integrally joined such that damage would result from their separation. While walls secured in such a manner may indeed be "fixedly" secured, there are certainly other ways that walls could be "fixedly" secured without damage being caused by their separation. Therefore, the Plaintiff's proposed construction is too narrow in light of the language of the Claim. The Defendants' proposed construction, being broader and more inclusive in this regard, is more consistent with the terms as used in the Claim and therefore is the more appropriate construction of the term.

This particular claim element also requires that the front and rear walls be "obliquely secured" to the side walls. Viewing the term "obliquely" in the context of the claims, it is clear that the term "obliquely" is used to describe the angle at which the walls of the cover are joined together. '975 Patent, Col. 3, lines 9-13. The common meaning of an "oblique angle" is "an acute or obtuse angle – distinguished from right angle." Webster's Third New International Dictionary at 1556. On this point, the parties do not have much of a disagreement: the Plaintiff contends that this term means that the angles between the walls are "not exact" right angles [Doc. 180 at 17], while the Defendants posit that the term means that the angle between the adjoining walls is "an angle that is not a right angle" [Doc. 182 at 18]. There is nothing in the specification or prosecution history to suggest that this term is used in the claims in a manner inconsistent with its common definition. Accordingly, the Court construes the term "obliquely" to mean that the angles of the walls are not right angles.

Finally, the Court agrees with the Defendants that the plain language of the phrase "the rear wall spaced from the front wall" means that the front wall and the rear wall are separated from each other by space.

For the foregoing reasons, the Court construes the phrase "wherein the front wall is fixedly and obliquely secured to the first side wall and the second side wall, and the rear wall is obliquely and fixedly secured to the first side wall and the second side wall, and the rear wall spaced from the front wall" to mean that the front and rear walls are immovably attached to the side walls; that the angles of attachment between the front and rear walls and the side walls are not right angles; and that the rear wall and the front wall are separated from each other by space.

> ### d. "a top wall extending coextensively to the front wall, the first side wall, the second side wall, and the rear wall to define a cavity within the cover"

The Plaintiff contends that the phrase "a top wall extending coextensively to the front wall, the first side wall, the second side wall, and the rear wall to define a cavity within the cover" should be construed to mean that the attic hatchway cover has a top wall that extends to the front wall, rear wall, and two side walls to define the space. [Doc. 180 at 18]. The Defendants argue, on the other hand, that this phrase should be construed to mean that the cover has a top wall that extends equally to each of the walls – the front wall, rear wall, and side walls – and that the top wall extends the full length of each wall, creating a container with four sides and a top, which together fully

enclose and cover an empty space. [Doc. 182 at 19-20]. Based upon the constructions proposed by the parties, it appears that the only term which requires discussion is the term "coextensively" and whether the use of such term requires that the top wall extends *equally to* and *along the full length* of each of the other walls, as suggested by the Defendants.

The common definition of "coextensive" is "having the same scope or boundaries." Webster's Third New International Dictionary at 439. The common meaning of the term "coextensive," as viewed in the context of the claim language, thus suggests that the top wall shares the same boundaries as the walls to which it adjoins. See '975 Patent, Col. 3, lines 13-16 ("a top wall extending coextensively to the front wall, the first side wall, the second side wall, and the rear wall to define a cavity within the cover"). This construction is supported by the patent's illustrations, which depict a top wall extending equally to and along the full length of each of the other walls. See id. at Figs. 2, 6. The specification describes this arrangement of walls as creating a "tent-like structure," which implies that a cavity, or empty space, is created within the cover. See id. at Abstract.

For the foregoing reasons, the Court construes the phrase "a top wall extending coextensively to the front wall, the first side wall, the second side

wall, and the rear wall to define a cavity within the cover" to mean that the attic hatchway cover has a top wall which extends equally to and along the full length of the front wall, rear wall, and two side walls, and that this arrangement of walls creates a container having four sides and a top which together fully enclose and cover an empty space.

### e. "the top wall having a zipper member"

The Plaintiff contends that the phrase "the top wall having a zipper member" simply means that the zipper member forms a portion of the top wall. The Plaintiff argues that this limitation does not foreclose the possibility that the zipper member is only partially contained in the top wall and is located as well in one or more of the other walls of the structure. [Doc. 180 at 18-19]. The Defendants argue, on the other hand, that this element requires that the claimed zipper to be located entirely within the top wall of the cover. [Doc. 185 at 20].

The patent language makes clear that the term "zipper member" is used in reference to an entire zipper, that is, "a fastener consisting of two rows of metal or plastic teeth on strips of tape for binding to the edges of an opening ... and having a sliding piece that closes the opening by drawing the teeth into interlocking position." Webster's Third New International Dictionary at 2659.

For example, Claim 4 of the '975 Patent, at Col. 3, lines 32-34, recites that "the *zipper member* is of a U-shaped configuration to direct the *zipper* along the top wall." Thus, a plain reading of this claim limitation suggests that the "zipper member" is a reference to the entire zipper.

Further, by claiming only one wall as "having a zipper member," the plain language of Claim 1 suggests that the entire zipper member is located within the top wall and is not located, in whole or in part, in any of the other walls of the structure. This interpretation of the claim language is consistent with the prosecution history. In an Office Action dated January 12, 1999, the Patent Examiner distinguished the present claims from the King patent in substantial part due to the fact that King's invention claims a zipper in the side walls whereas the patent-in-suit claims a zipper within the top wall, which zipper creates a flap that is hingedly secured to the top wall. See Doc. 182-10 at 6 ("Claims 1-6 are allowable over the prior art of record as there is inadequate teachings or suggestions for providing *the zipper member in the top wall to create a flap*.") (emphasis added). The inventor confirmed the Patent Examiner's interpretation of these claims in his response to this Office Action. See Doc. 185-5 at 5 ("Applicant submits that [the prior art], either alone or in combination, do[es] not teach a 'flap' formed with the 'zipper

member' and the 'top wall' as recited in amended independent claim 7."). This exchange between the Patent Office and the inventor demonstrates not only that the Patent Examiner understood the zipper member to be contained entirely within the top wall and that this distinction was a principle basis for issuance of the Patent, but also that the inventor accepted the Patent Examiner's interpretation. For these reasons, the Court concludes that the phrase "the top wall having a zipper member" as used in Claim 1 means that the entire zipper is contained within the top wall of the cover.

### f. "the zipper member having a first end spaced from a second end"

The Plaintiff proposes that the phrase "the zipper member having a first end spaced from a second end" means that the zipper member has a beginning and an end that are distinct and not continuous. [Doc. 180 at 19-20]. The Defendants propose a similar construction, arguing that this phrase means that the two ends of the zipper member are not connected and that there is enough distance between the two ends that they do not touch. [Doc. 182 at 22-23]. Because the term "spaced" implies some sort of distance, the Court finds that the Defendants' proposed construction better captures the meaning of this term within the context of the claims. Therefore, the Court construes the phrase "the zipper member having a first end spaced from a

second end" to mean that the zipper has two ends which are not connected and do not touch.

> ### g. "the top wall having a flap hingedly secured to the top wall between the first end and the second end, and selectively secured to the top wall through the zipper member"

The Plaintiff argues that the phrase "the top wall having a flap hingedly secured to the top wall between the first end and the second end, and selectively secured to the top wall through the zipper member" should be construed simply to mean that the attic hatchway cover has a flap hingedly secured to the top wall between the beginning and end of the zipper member and selectively secured to the top wall via the zipper member, almost exactly as the claim element itself is written. The Plaintiff argues that this claim element does not foreclose the possibility that the beginning and the end of the zipper member themselves (or any other portion of the zipper member) form a part of this hinge. [Doc. 180 at 20-21].

The Defendants argue, on the other hand, that this limitation requires that the zipper member define the outer edges of the flap, and that the only area of the flap not surrounded by the zipper member is at the point of the flap's hinged, i.e., pivotal, securement. The Defendants further argue that the claim requires the flap to be secured through the zipper member, so that

when the flap is unzipped, it pivots between the two ends of the zipper member as though hinged.  [Doc. 182 at 23-24].

The claim recites that the top wall of the attic hatchway cover has a flap that is "hingedly secured ... *between* the first end and the second end" of the zipper.  '975 Patent, Col. 3, lines 19-20 (emphasis added).  The use of the term "between" suggests that the flap hinges from the top wall in the space that separates the beginning and end of the zipper member and that the zipper member itself does not form any part of this hinge.  This interpretation is consistent with the patent drawings, which illustrate that the zipper member defines the edges of the flap and that the only area of the flap that is hingedly secured to the top wall is the area not surrounded by the zipper.  See id. at Figs. 2, 4.

The claim further recites that the flap's point of securement is "hinged."  The specification indicates that this hinged point of securement serves "to permit *pivoting* of the flap relative to the top wall of the hatchway cover."  '975 Patent, Col. 1, lines 35-36 (emphasis added).

Additionally, the claim recites that the flap is "selectively secured" to the top wall by the zipper member.  The patent makes clear that the selective securement of the flap results from the zipping and unzipping of the zipper

member and that when the zipper member is unzipped, the portion of the flap that was selectively secured by the zipper member may be separated from the top wall. See id. at Abstract ("*In a preferred embodiment, the* top wall of the cover employs a flap member selectively securable to the top wall and displaceable therefrom by use of a generally U-shaped zipper to disengage the flap relative to the top wall."); Col 1, lines 32-26 ("The attic hatchway cover of the invention includes a cover structure ... having a top wall utilizing a flexible flap, with access therethrough by utilization of a U-shaped zipper arranged to permit pivoting of the flap relative to the top wall of the hatchway cover."); Col. 2, lines 21-26 ("Specifically, a top wall flap 27 contained within the top wall is ... of flexible construction ... such that ... *the* U-shaped zipper ... *member* 28 separates the top wall flap 27 relative to the top wall for access through the top wall.") (emphasis in original).

For these reasons, the Court construes the phrase "the top wall having a flap hingedly secured to the top wall between the first end and the second end, and selectively secured to the top wall through the zipper member" to mean that the top wall includes a section that forms a flap and that when said flap is unzipped from the top wall, it pivots between the two ends of the zipper member as though hinged.

### 2.    Claim 2

Claim 2 of the '975 Patent is a dependent claim of Claim 1 and provides for "[a] cover as set forth in claim 1 wherein the flap is formed of flexible construction."  '975 Patent, Col. 3, lines 25-26.  The Defendants argue that the term "flexible construction" should be construed to mean that the attic hatchway cover has a flap that is easily bendable, rather than rigid.  [Doc. 182 at 24-25].   The Plaintiff contends that this dependent claim should be construed to mean that the attic hatchway cover "has a flap that is flexible," without any further definition, and it further argues that the Defendants' proposed construction is "drawn out of thin air" and offers no guidance in determining what the claim terms mean.  [Doc. 180 at 24; Doc. 184 at 22].

The common and ordinary meaning of the term "flexible" suggests something that is capable of being bent, flexed, turned, bowed or twisted without breaking.  See Webster's Third New International Dictionary at 869 (defining "flexible" as "capable of being flexed: capable of being turned, bowed, or twisted without breaking"); Merriam-Webster's Online Dictionary, http://www.merriam-webster.com/ dictionary/flexible (last visited Oct. 21, 2008) (defining "flexible" as "capable of being flexed");

http://encarta.msn.com/dictionary_/flexible.html (last visited October 21, 2008) (defining "flexible" as "able to bend without breaking").  As previously discussed supra, the term "flexible" is often defined as the opposite of rigid.

The use of the term "flexible" within the specification is consistent with this common and ordinary meaning.  The specification distinguishes "flexible construction" from construction that is "rigid."  See '975 Patent, Col. 2, lines 21-23 ("a top wall flap 27 is contained within the top wall is ... of flexible construction, although as an alternative may be rigid").  Further, the specification suggests that a flap of flexible construction would be "more manually manipulative" than a flap of rigid construction.  See id. at Col. 2, lines 26-31 ("The flexible construction of the top wall flap 27 would be more manually manipulative in use, or alternatively a rigid cover that employs a flexible and hinged connection relative to the top wall between the free distal ends of the U-shaped zipper would also function to permit access through the top wall.").  For these reasons, the Court concludes that the phrase "wherein the flap is formed of flexible construction" to mean that the flap is constructed in such a way that it is capable of being bent, flexed, turned, bowed or twisted without breaking.

### 3. Claim 3

Claim 3 of the '975 Patent provides as follows:

> A cover as set forth in claim 2 wherein at least the front wall, the rear wall, and the first side wall and the second side wall each have an inner surface spaced from an outer surface, and a core extending coextensively between the inner surface and the outer surface.

'975 Patent, Col. 3, lines 27-31. The Plaintiff argues that this claim should be construed to mean that the attic hatchway cover has a front wall, a rear wall, and side walls that have an inner surface and an outer surface, with a core material extending between the inner surface and the outer surface. [Doc. 180 at 25]. The Defendants argue, on the other hand, that this claim should be construed to mean that each of the front, rear, and side walls has three layers: an outer layer on each side of the wall, and a central core within the wall that reaches and touches both outer layers equally. [Doc. 182 at 25].

The specification describes "an insulative core 31 extending coextensively between the inner wall 29 and the outer wall 30 coextensive of a respective wall structure." '975 Patent, Col. 2, lines, 51-54. The patent drawings illustrate that the walls are constructed from three layers of material. See id. at Figs. 5, 6. As discussed supra, the use of the term "coextensive" within the claim suggests that the core of the wall has the same scope and

boundaries as the inner and outer surfaces of the walls. Thus, according to the plain meaning of the term "coextensive," the core of the wall must reach and touch the inner surface and outer surface of the wall equally.

For these reasons, the Court construes "[a] cover ... wherein at least the front wall, the rear wall, and the first side wall and the second side wall each have an inner surface spaced from an outer surface, and a core extending coextensively between the inner surface and the outer surface" to mean that the front wall, rear wall, and two side walls of the attic hatchway cover each is comprised of three layers: (1) an inner surface, (2) an outer surface, and (3) a core that reaches and touches both the inner surface and outer surface equally.

### 4.    Claim 4

Claim 4 of the '975 Patent provides as follows:

> A cover as set forth in claim 3 wherein the zipper member is of a U-shaped configuration to direct the zipper along the top wall in adjacency to the second side wall, the front wall, and the first side wall, with a first leg of the zipper member extending parallel to the first side wall, a second leg of the zipper member extending parallel to the second side wall, and a third leg of the zipper member extending generally parallel to the front wall.

'975 Patent, Col. 3, lines 32-39.  The Defendants argue that this claim should be construed to mean that the cover has a U-shaped zipper member that has two straight sides that run parallel to the side walls and a bottom that is generally parallel to the front wall, and that the respective ends of the zipper member stop at some point short of the rear wall so that the flap can be "hingedly secured" to the top wall.  [Doc. 182 at 26].  The Plaintiff argues that this particular claim requires that the zipper member zip adjacent to at least three sides of the cover, but that it is not limited to a U-shaped configuration, as suggested by the Defendants.  [Doc. 180 at 25-26].

The plain language of Claim 4 limits the scope of this dependent claim to a cover which has a zipper member which is in the shape of a "U."  The parties apparently dispute the meaning of "U-shaped," but the plain meaning of this term is clear: a "U-shaped" zipper member will have two substantially symmetrical sides and a bottom, with a substantially centrally located opening between the two sides at their top ends.  This shape will look more like a "U" than like an "O" or a "D."  The three-sided nature of the U-shaped zipper member is confirmed by the claim language, which specifies three legs to the zipper member: the first leg of the zipper member extending adjacent and parallel to the first side wall; the second leg extending adjacent and parallel

35

to the second side wall; and the third leg extending adjacent and "generally parallel" to the front wall. '975 Patent, Col. 3, lines 35-38. This three-sided "U-shape" also is illustrated in Figures 2 and 4 of the patent drawings. See id. at Figs. 2, 4. The Plaintiff's proposed construction – that the U-shaped zipper member claimed in this dependent claim could be four-sided or otherwise in an "O" shape – is simply not supported by the claim language or the intrinsic evidence.

The Court agrees with the Defendants that the terms "parallel" and "in adjacency" as used in this claim should be accorded their ordinary meanings and thus the zipper member must (1) be parallel, that is, extend in the same direction as the referenced wall, at a fixed distance from it, without ever meeting or touching it, and (2) be "in adjacency," that is, it must be near the referenced wall.

Accordingly, the Court adopts the Defendants' proposed construction of this claim and thus construes Claim 4 of the '975 Patent to mean that the attic hatchway cover has a three-sided, U-shaped zipper member, the first leg of which extends adjacent and parallel to the first side wall; the second leg of which extends adjacent and parallel to the second side wall; and the third leg of which is generally parallel to the front wall. The term "parallel" means that

the zipper member extends in the same direction as the referenced wall, at a fixed distance, without ever meeting or touching it. The term "in adjacency" means that the zipper member is near the referenced wall.

### 5. Claim 7

Claim 7 is the second independent claim of the '975 Patent and provides as follows:

> *7. An attic hatchway cover arranged for securement onto a framework of an attic opening, wherein the cover comprises:*
>
> *a first side wall spaced from a second side wall and a front wall spaced from a rear wall, wherein said front wall is fixedly and obliquely secured to said first side wall and said second side wall and said rear wall is obliquely and fixedly secured to said first side wall and said second side wall, a top wall extending coextensively to said front wall, said first side wall, said second side wall and said rear wall to define a cavity within the cover; and*
>
> *means for providing access to the attic through the cover and the attic opening, said means for providing access comprising a generally U-shaped zipper member having a first end spaced from a second end, said zipper member forming a flap with said top wall, said flap selectively secured to the top wall by said zipper member;*
>
> *wherein said top wall comprises a hinge extending from said first side wall to said second side wall, said flap secured to said top wall by said hinge between*

> *said first end of said zipper member and said second end of said zipper member; and*
>
> *wherein said front wall, said rear wall, said first side wall and said second side wall are each of a rigid construction.*

'975 Patent, Col. 3, line 61 to Col. 4, line 21 (emphasis in original).[5]

> **a.** **"*a first side wall spaced from a second side wall and a front wall spaced from a rear wall, wherein said front wall is fixedly and obliquely secured to said first side wall and said second side wall and said rear wall is obliquely and fixedly secured to said first side wall and said second side wall, a top wall extending coextensively to said front wall, said first side wall, said second side wall and said rear wall to define a cavity within the cover*"**

The parties have stipulated that this claim limitation should be construed identically to the first three elements of Claim 1, the slight differences in terminology notwithstanding. [Joint Stipulation, Doc. 179-2 at 7]. The Court agrees that this limitation is substantially similar to the first three elements of

---

[5]As a reissue of the '833 Patent, the '975 Patent is marked in a manner that shows what remained from the original patent and what changes were made with the reissue. Thus, language from the original patent that was deleted by the reissue is shown in brackets and language that was added to the original patent by the reissue is shown in italics. See '975 Patent, Col. 1, lines 3-6. Because Claim 7 was added to the Patent through the reissue, the entire claim is italicized.

Claim 1, discussed <u>supra</u>, and will therefore apply the same construction to this limitation.

> **b.** **"*means for providing access to the attic through a cover and the attic opening, said means for providing access comprising a generally U-shaped zipper member having a first end spaced from a second end, said zipper member forming a flap with said top wall, said flap selectively secured to the top wall by said zipper member*"**

This element of Claim 7 defines a means for providing access to the attic through the attic hatchway cover and the attic opening. The Plaintiff argues that this limitation should be construed to mean that the attic hatchway cover provides access via a zipper member that (1) has a beginning and an end that are distinct; (2) zips adjacent to at least three sides of the attic hatchway cover; (3) forms a flap within the top wall; and (4) selectively secures the flap to the top wall. [Doc. 180 at 27-28]. The Defendants argue that this limitation requires a generally U-shaped zipper member, such as the one claimed in Claim 4, and a flap created by said zipper member that is connected to the rest of the top wall at the area between the ends of the zipper member. [Doc. 182 at 22-23].

The Court already has construed the terms that comprise this claim in discussing the previous claims and therefore will apply the same construction

of these terms to Claim 7. Accordingly, the Court construes the phrase "means for providing access to the attic through a cover and the attic opening, said means for providing access comprising a generally U-shaped zipper member having a first end spaced from a second end, said zipper member forming a flap with said top wall, said flap selectively secured to the top wall by said zipper member" to mean that the attic hatchway cover provides a means of access to the attic, and that such means consists of a generally three-sided U-shaped zipper member, which has two ends that are not connected and do not touch, and that the zipper member creates a flap within the top wall and selectively secures said flap to said top wall. The portion of the flap that is selectively secured may be separated from the top wall by unzipping the zipper member.

      c.    **"*wherein said top wall comprises a hinge extending from said first side wall to said second side wall, said flap secured to said top wall by said hinge between said first end of said zipper member and said second end of said zipper member*"**

The Plaintiff contends that this limitation requires the attic hatchway cover to have a hinge "disposed between and extending towards" the side walls and securing the flap to the top wall between the beginning and end of the zipper member. The Plaintiff argues that this construction comports with

the ordinary meaning of the claim language and is consistent with the Figures 2 and 4 of the Patent.  [Doc. 180 at 28-29].  The Defendants argue, on the other hand, that like the "hingedly secured" limitation in Claim 1, this limitation requires the flap to be contained within the top wall and the flap's point of permanent attachment to the remainder of the top wall to be located between the two ends of the zipper member.  [Doc. 182 at 23-24].

The Court begins with the language of the claim itself.  Claim 7 describes a hinge connecting the flap to the remainder of the top wall.  The claim language explicitly provides that this hinge extends across the top wall "from first side wall to said second side wall."  '975 Patent, Col. 4, lines 14-15.  This language appears to require a hinge in the top wall that begins *at* the first side wall and ends *at* the second side wall.  The Plaintiff argues that this limitation requires the hinge "towards" the side walls.  A hinge extending "towards" the side walls, however, implies a hinge in the top wall that begins and ends somewhere between the side walls, which is not what the plain language of the claim requires.

The limitation further describes the flap as being secured to the top wall "by said hinge between said first end of said zipper member and said second end of said zipper member."  Id. at Col. 4, lines 16-18.  This language implies

not only that the entire hinge lies between the ends of the zipper member, as discussed supra, but also that the entire hinge secures the flap to the top wall. If the entire hinge lies between the zipper member ends, and the hinge extends across the top wall from one side wall to the other, then this claim language requires that the zipper member be located on the edge of the top wall, at or adjacent to the connection with the side walls, so that (1) the hinge lies between the zipper member ends and (2) the hinge extends from one side wall to another.

The prosecution history sheds further light on the location of the hinge within the top wall. As originally filed, Claim 7 provided that the rear wall of the cover comprised the hinge. The Patent Examiner rejected the claim, noting that the patent "description and figures disclose the hinge at the top wall adjacent the rear wall" and found no support in the written description for the rear wall comprising a hinge. [Doc. 171-15 at 13]. Claim 7 was amended to recite "wherein said top wall comprises a hinge" in order to clarify the relationship of the hinge with the top wall, and the claim was allowed. [Id. at 171-15 at 17].

For these reasons, the Court construes the phrase "wherein said top wall comprises a hinge extending from said first side wall to said second side

wall, said flap secured to said top wall by said hinge between said first end of said zipper member and said second end of said zipper member" to mean that the top wall comprises a hinge which is adjacent to the rear wall and extends across the top wall from the first side wall to the second side wall and that the flap is secured to the top wall by the hinge between the ends of the zipper member.

### d. "*wherein said front wall, said rear wall, said first side wall and said second side wall are each of a rigid construction*"

The parties have stipulated that this claim limitation should be construed in the same manner as this limitation was construed for the purposes of Claim 1. [Doc. 179-2 at 8]. The Court hereby construes the phrase "wherein said front wall, said rear wall, said first side wall and said second side wall are each of a rigid construction" to mean that the front, rear, and side walls of the cover are made in such a way that each wall is inflexible.

### 6. Claim 8

Claim 8 of the '975 Patent provides as follows:

> A cover as set forth in claim 7 wherein at least said front wall, said rear wall, said first side wall and said second side wall each have an inner surface spaced from an outer surface and a core extending coextensively between the inner surface and the outer surface.

'975 Patent, Col. 4, lines 22-26.

The parties have stipulated that the phrase "wherein at least said front wall, said rear wall, said first side wall and said second side wall each have an inner surface spaced from an outer surface and a core extending coextensively between the inner surface and the outer surface" should be construed in the same manner as that phrase was construed with respect to Claim 3, and that the slight differences in terminology do not require a different construction. [Doc. 179-2 at 9]. Accordingly, the Court construes this phrase to mean that the front wall, rear wall, and two side walls of the attic hatchway cover each is comprised of three layers: (1) an inner surface, (2) an outer surface, and (3) a core that reaches and touches both the inner surface and outer surface equally.

## **O R D E R**

**IT IS, THEREFORE, ORDERED** that the Plaintiff's Motion for Claim Construction [Doc. 180] and the Defendants' Motion for Claim Construction [Doc. 181] are **GRANTED** to the extent that the disputed claim terms of U.S. Patent No. Re. 36,975 are hereby construed as follows:

A.  The phrase "wherein the front wall, the rear wall, the first side wall, and the second side wall are each of a rigid construction" in Claim 1 is construed to mean that the front, rear, and side walls of the cover are made in such a way that each wall is inflexible.

B.  The phrase "a first side wall spaced from a second side wall and a front wall connected to a rear wall" in Claim 1 is construed to mean that the attic hatchway cover has a front wall, a rear wall, and two side walls that are connected or formed to define a space.

C.  The phrase "wherein the front wall is fixedly and obliquely secured to the first side wall and the second side wall, and the rear wall is obliquely and fixedly secured to the first side wall and the second side wall, and the rear wall spaced from the front wall" in Claim 1 is construed to mean that the front and rear walls are immovably attached to the side walls; that the angles of attachment between the front and rear walls and the side walls are not right angles; and that

the rear wall and the front wall are separated from each other by space.

D.   The phrase "a top wall extending coextensively to the front wall, the first side wall, the second side wall, and the rear wall to define a cavity within the cover" in Claim 1 is construed to mean that the attic hatchway cover has a top wall which extends equally to and along the full length of the front wall, rear wall, and two side walls, and that this arrangement of walls creates a container having four sides and a top which together fully enclose and cover an empty space.

E.   The phrase "the top wall having a zipper member" in Claim 1 is construed to mean that the entire zipper is contained within the top wall of the cover.

F.   The phrase "the zipper member having a first end spaced from a second end" in Claim 1 is construed to mean that the zipper has two ends which are not connected and do not touch.

G.    The phrase "the top wall having a flap hingedly secured to the top wall between the first end and the second end, and selectively secured to the top wall through the zipper member" in Claim 1 is construed to mean that the top wall includes a section that forms a flap and that when said flap is unzipped from the top wall, it pivots between the two ends of the zipper member as though hinged.

H.    The phrase "wherein the flap is formed of flexible construction" in Claim 2 is construed to mean that the flap is constructed in such a way that it is capable of being bent, flexed, turned, bowed or twisted without breaking.

I.    The phrase "[a] cover ... wherein at least the front wall, the rear wall, and the first side wall and the second side wall each have an inner surface spaced from an outer surface, and a core extending coextensively between the inner surface and the outer surface" in Claim 3 is construed to mean that the front wall, rear wall, and two side walls of the attic hatchway cover each is comprised of three layers: (1) an inner surface, (2) an outer surface, and (3) a core

that reaches and touches both the inner surface and outer surface equally.

J.      The phrase "wherein the zipper member is of a U-shaped configuration to direct the zipper along the top wall in adjacency to the second side wall, the front wall, and the first side wall, with a first leg of the zipper member extending parallel to the first side wall, a second leg of the zipper member extending parallel to the second side wall, and a third leg of the zipper member extending generally parallel to the front wall" in Claim 4 is construed to mean that the attic hatchway cover has a three-sided, U-shaped zipper member, the first leg of which extends adjacent and parallel to the first side wall; the second leg of which extends adjacent and parallel to the second side wall; and the third leg of which is generally parallel to the front wall.  The term "parallel" means that the zipper member extends in the same direction as the referenced wall, at a fixed distance, without ever meeting or touching it.   The term "in adjacency" means that the zipper member is near the referenced wall.

K.    The phrase "a first side wall spaced from a second side wall and a front wall spaced from a rear wall, wherein said front wall is fixedly and obliquely secured to said first side wall and said second side wall and said rear wall is obliquely and fixedly secured to said first side wall and said second side wall, a top wall extending coextensively to said front wall, said first side wall, said second side wall and said rear wall to define a cavity within the cover" in Claim 7 is construed in the same manner as the first three elements of Claim 1.  Thus, the phrase "a first side wall spaced from a second side wall and a front wall connected to a rear wall" is construed to mean that the attic hatchway cover has a front wall, a rear wall, and two side walls that are connected or formed to define a space.  The phrase "wherein said front wall is fixedly and obliquely secured to said first side wall and said second side wall, and said rear wall is obliquely and fixedly secured to said first side wall and said second side wall" is construed to mean that the front and rear walls are immovably attached to the side walls, and that the angles of attachment between the front and rear walls and the side walls are not right

angles.  The phrase "a top wall extending coextensively to said front wall, said first side wall, said second side wall, and said rear wall to define a cavity within the cover" is construed to mean that the attic hatchway cover has a top wall which extends equally to and along the full length of the front wall, rear wall, and two side walls, and that this arrangement of walls creates a container having four sides and a top which together fully enclose and cover an empty space.

L.     The phrase "means for providing access to the attic through a cover and the attic opening, said means for providing access comprising a generally U-shaped zipper member having a first end spaced from a second end, said zipper member forming a flap with said top wall, said flap selectively secured to the top wall by said zipper member" in Claim 7 is construed to mean that the attic hatchway cover provides a means of access to the attic, and that such means consists of a generally three-sided U-shaped zipper member, which has two ends that are not connected and do not touch.  The zipper member creates a flap within the top wall and selectively secures said flap to said top wall top wall.

The portion of the flap that is selectively secured may be separated from the top wall by unzipping the zipper member.

M.     The phrase "wherein said top wall comprises a hinge extending from said first side wall to said second side wall, said flap secured to said top wall by said hinge between said first end of said zipper member and said second end of said zipper member" in Claim 7 is construed to mean that the top wall comprises a hinge which is adjacent to the rear wall and extends across the top wall from the first side wall to the second side wall and that the flap is secured to the top wall by the hinge between the ends of the zipper member.

N.     The phrase "wherein said front wall, said rear wall, said first side wall and said second side wall are each of a rigid construction" in Claim 7 is construed in the same manner as this limitation was construed for the purposes of Claim 1 and therefore is construed to mean that the front, rear, and side walls of the cover are made in such a way that each wall is inflexible.

O.     The phrase "wherein at least said front wall, said rear wall, said first side wall and said second side wall each have an inner

surface spaced from an outer surface and a core extending coextensively between the inner surface and the outer surface" in Claim 8 is hereby construed in the same manner as that phrase was construed with respect to Claim 3 and thus is construed to mean that the front wall, rear wall, and two side walls of the attic hatchway cover each is comprised of three layers: (1) an inner surface, (2) an outer surface, and (3) a core that reaches and touches both the inner surface and outer surface equally.

**IT IS SO ORDERED**.

Signed: December 8, 2008

Martin Reidinger
United States District Judge